# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

KAREN MENCARELLI,         )
                            )

    **Plaintiff,**          )
                            )

**v.**                      )      **Civil No. 3:14-cv-01879**
                            )      **Judge Aleta A. Trauger**
                            )

**ALFRED WILLIAMS & COMPANY,**    )
                            )

    **Defendant.**        )

## <u>MEMORANDUM</u>

Defendant Alfred Williams & Company ("AWC") has filed a Motion for Summary Judgment (Docket No. 24), to which plaintiff Karen Mencarelli ("Mencarelli") has filed a Response in opposition (Docket No. 31), and AWC has filed a Reply (Docket No. 36). For the following reasons, the motion will be granted.

## <u>FACTS AND PROCEDURAL BACKGROUND</u>

This case involves an allegation by Mencarelli that AWC intentionally discriminated against her based on her age.[1] Mencarelli is a resident of Davidson County, Tennessee. AWC is a North Carolina corporation, with a principal place of business in Raleigh, North Carolina, that transacts business in the state of Tennessee.

---

[1] Facts are drawn from AWC's Statement of Undisputed Material Facts (Docket No. 26), Mencarelli's Response thereto ("RSUMF") (Docket No. 32), Mencarelli's Statement of Additional Material Facts (Docket No. 31, Att. 1), AWC's Response thereto ("RSAMF") (Docket No. 37), and the record evidence cited therein. The significant majority of material facts in this matter are undisputed for the purposes of summary judgment; the court notes if the parties disagree over facts they consider to be material to the pending motion. In addition, multiple facts adduced by the plaintiff in the Statement of Additional Material Facts are immaterial and thus not addressed by the court herein.

AWC is a furniture dealership operating in multiple markets in the southeast United States. AWC operates a branch office to serve the Nashville, Tennessee market. Ted Limmer ("Limmer") has been the market president of AWC's Nashville branch since May 2011. As market president, Limmer's job duties include managing the design, sales (*i.e.*, "account") management, and project management departments at AWC's Nashville branch; managing AWC's brand in the Nashville market; business development; and networking. AWC employees in the Nashville office include account managers, designers, and project managers. Account managers' duties at AWC include managing any existing accounts, looking for new account opportunities to grow AWC's business, and, overall, functioning as the liaison between AWC and its account customers. Designers' job duties include working closely with the account manager to understand the customer's needs and ensure that the furniture selected for a specific project fits within the designated space and is ordered and installed correctly. Designers at AWC are not assigned to a specific account manager but, rather, support multiple account managers. A designer may ask for another designer's assistance if they are overwhelmed with work. AWC uses a team structure to service its customers, with account managers managing the day-to-day relationship with each account, each designer supporting different account managers and accounts, and project managers being assigned to assist specific account managers on projects as needed.[2]

Before the summer of 2012, Mencarelli had worked for approximately seven years as an account manager in Florida for JC White Office Furniture ("JC White"). The University of

---

[2] Although not explicitly stated by the parties, it is implied that project managers' duties involve working to assist with specific projects of significance.

Miami was Mencarelli's largest account at JC White. In March or April of 2012, Mencarelli sent an email to Limmer, with her resume, indicating a desire to leave Florida and move to Nashville, and inquiring about opportunities with AWC. After this initial email, Limmer and Mencarelli spoke over the phone multiple times about a position at AWC. These conversations included discussion of (1) the fact that the AWC account manager who was handling AWC's Vanderbilt University ("Vanderbilt") account was resigning and (2) Mencarelli's experience handling the University of Miami account at JC White. These conversations eventually led to Mencarelli's traveling to AWC's Nashville office for interviews in June of 2012. Mencarelli met with Limmer and the account manager who had been handling the Vanderbilt account.

After the in-person interviews, Limmer offered Mencarelli an account manager position paying a salary of $40,000 a year. Mencarelli made a counteroffer of $50,000 annually. Limmer accepted the counteroffer and formally decided to hire Mencarelli. On June 20, 2012, Mencarelli signed an offer letter formally accepting AWC's offer to become an account manager in AWC's Nashville branch. For the first year of employment, AWC agreed to pay Mencarelli a $50,000 annual salary with the opportunity to make a twenty percent commission on all "loaded gross profit exceeding $200,000" that she invoiced; after one year of employment, Mencarelli would transition to a draw against commissions based on AWC's standard commission program. (Docket No. 32, RSUMF No. 16.) At the time of Mencarelli's hiring, she was 48 years old. According to Limmer, the main factors in his hiring of Mencarelli were her prior experience in higher education, her industry experience, and her knowledge of managing customers and expectations. Moreover, Limmer hired Mencarelli specifically to handle AWC's account with Vanderbilt – a significant and challenging account in the Nashville market – and

Mencarelli knew at the time of her hire that the Vanderbilt account would be her primary responsibility. Limmer's intent was that Mencarelli would eventually be in charge of all higher education accounts in middle Tennessee for AWC, once she "got her arms around" the Vanderbilt account. (Docket No. 32, RSUMF No. 21.)

Mencarelli's first day of employment at AWC was August 1, 2012. Mencarelli's primary role as the account manager on the Vanderbilt account was to be the liaison between Vanderbilt and the AWC team. On the Vanderbilt account, Mencarelli's primary contacts were three employees in Vanderbilt's Purchasing Department, named Stephanie Sieve, Jane (Mencarelli could not remember her last name), and Pam Gilben. After an initial transition period that involved other account managers working with Vanderbilt, and once Mencarelli was settled into managing the account, AWC's Vanderbilt team consisted of Mencarelli as account manager, Piper Fritsch ("Fritsch") as designer, Kim Gardner ("Gardner") as project manager, and Limmer if needed.

Although Fritsch was AWC's designer for the Vanderbilt account, she serviced other account managers besides Mencarelli and had to divide her time between Mencarelli's accounts and the accounts of the other account managers. Mencarelli was made aware of this fact when she was hired. However, after they began to work together, Fritsch began to feel "dumped on" at times by Mencarelli.[3] (Docket No. 32, RSUMF No. 30.) Fritsch also felt that Mencarelli did not respect her time, and Fritsch did not feel that she had Mencarelli's support as a partner for the majority of the projects that she was working on. Fritsch expressed frustrations to Limmer about

---

[3] There was no way for Fritsch to reduce the workload assigned by Mencarelli unless she could delegate to other designers. There is no evidence in the record as to whether other designers had any time available to assist Fritsch in this way.

Mencarelli on multiple occasions. Limmer found Mencarelli's conduct in over-utilizing or monopolizing Fritsch's time to be unprofessional, and Limmer repeatedly counseled Mencarelli about it.

Limmer also required account managers to look for opportunities to support project managers and designers. On one occasion, Limmer had asked Mencarelli to help Fritsch, and Fritsch stated that Mencarelli could do so "by picking finishes"[4] *(see* Docket No. 32, RSUMF No. 30), but Mencarelli did not help in this way. Rather, Mencarelli asked an intern named Kaitlin to pick the finishes for her. Limmer found this conduct to be unprofessional.[5]

After the end of her first year of employment at AWC, Mencarelli was concerned about not bringing in the amount of revenue for a substantial commission payment as her offer letter had envisioned. Mencarelli and Limmer discussed the matter, and Limmer agreed that Mencarelli could remain on the guaranteed $50,000 salary for the time being.

Mencarelli believed that she had "personality conflicts" with Limmer and that Limmer "did not like [her] as a person." (Docket No. 32, RSUMF No. 35.) Mencarelli believed that, throughout her employment at AWC, Limmer was picking on her, did not like her personality, and did not like the way that she did business. Mencarelli claims that she first noticed that she

---

[4] "Finishes" are fabric swatches.

[5] Mencarelli suggests that Limmer only instructed her to "learn" how to pick finishes (in isolation). This is not a viable reading of Limmer's deposition testimony. It is clear from the deposition testimony that Limmer wanted Mencarelli to either pick the finishes herself without assistance or to be taught how to do it by someone else and then do it. Either way, Limmer did not give permission for the assignment to be handed off to another employee. (*See* Docket No. 31-2 (Ex. 1) at pp. 53-54 ("But the next thing I know, Karen had gone to Kaitlin, and she's asked Kaitlin to go select the [swatches]. . . . [A]s your boss, I've asked you to either go pull [the swatches] yourself or go have someone teach you how to do it. But she, then, is employing another team member to stop what they're doing to go.").)

was having personality problems with Limmer three weeks into her employment, after Limmer asked Mencarelli to assist on a bid for work, and Mencarelli felt that Limmer was not offering her needed assistance.

According to Mencarelli, every month, Limmer called Mencarelli into his office to suggest something, to complain about something, or to tell her something about the way she was doing business or the way that Mencarelli was conducting herself.[6] For example, AWC representatives, including Limmer and Mencarelli, attended a meeting at Vanderbilt for the kickoff of AWC's work on the Kissam dormitory, a large, $1.5 million project for AWC. During this meeting, Mencarelli did not take notes, and, after the meeting, Limmer counseled Mencarelli for not taking notes because, in Limmer's view, it looked unprofessional and could have signaled to Vanderbilt that Mencarelli was not interested in the project. Limmer also believed that Mencarelli's lack of notetaking also sent the wrong message of lack of interest to Mencarelli's AWC team.[7]

Mencarelli would leave work around 5:00 p.m. if she wasn't working jointly on a project with anyone, if she was done for the day, or if the other employees at the office were working on

---

[6] AWC does not require Market Presidents to document counseling sessions with employees regarding performance issues. There is evidence that Limmer provided performance reviews to some of his employees, although Mencarelli did not receive one. Limmer testified that he normally gave formal performance reviews to salaried employees but not to account managers (who typically work in the AWC commission structure and are not salaried), because Limmer was in close contact with, and constantly giving counseling to, account managers throughout the year as a matter of course in his role as Market President.

[7] Mencarelli raises the fact that she asked questions during the meeting and interjected on important topics. This is undisputed. However, it is immaterial as to whether or not Mencarelli actually took notes and whether or not her lack of notetaking actually appeared concerning to Vanderbilt or sent the wrong message to AWC team members, because the court's analysis must necessarily focus on Limmer's *perception* of this conduct and its impact on Vanderbilt and the AWC team.

matters not pertaining to her.  She would not bring her laptop computer home.  Limmer thought this routine was unprofessional and counseled Mencarelli about these matters: he encouraged Mencarelli to stay and work after 5 p.m. or, at least, to take her laptop computer home so that other AWC employees would think that she was still working.[8]  Limmer told Mencarelli that other employees had been noticing that she was leaving from work at the same time every day and was not taking work home (while they were still working).[9]

Market presidents at AWC make the ultimate decisions on how to allocate accounts among account managers in each individual market.  Mencarelli claims that, when new business came into AWC from large architectural (as opposed to higher education) firms, Limmer gave that business to another account manager, Sera Cremona, who was younger and less experienced. It is undisputed that, during her employment with AWC, Mencarelli expressed interest in those accounts, but she never complained to Limmer or Limmer's superior, John McKinney, about the accounts being given to Cremona; Mencarelli only commented about it to non-supervisory co-workers.

In addition, Mencarelli asked Limmer if she could work on some of the accounts of Rebecca Klements (an account manager who had resigned), but Limmer informed Mencarelli that he had already given Klements' accounts to Julia St. Clair, a newly hired account manager at

_____

[8] Mencarelli indicates that she was always available by email or phone after she left work.  However, this is immaterial to Limmer's counseling or its subject (*i.e.*, the optics of Mencarelli's departure routine and the perception of other AWC employees of it).

[9] Besides counseling her on taking notes and taking her laptop computer home, at her deposition Mencarelli could not think of another example of Limmer "picking on" her.  (Docket No. 32, RSUMF No. 44.)  Mencarelli believed the issues that Limmer counseled her on were irrelevant to how she did her job, but she knew that Limmer was "not happy" with her.  (*Id.*, RSUMF No. 45.)

AWC. During this conversation with Limmer, Mencarelli did not complain to Limmer that she believed he had given Klements' accounts to St. Clair because St. Clair was younger than Mencarelli.

Market presidents at AWC are also charged with making final decisions regarding whether an employee should be terminated. As Mencarelli's employment continued, Limmer became concerned that Vanderbilt's confidence in Mencarelli was starting to diminish and that AWC might be losing other opportunities with Vanderbilt as a result.[10] One of Vanderbilt's procurement team members, Stephanie Sieve, approached Limmer and mentioned to him that she

---

[10] Mencarelli attempts to create a dispute as to this fact by referring to testimony by Limmer that (1) the Vanderbilt account was "maintaining" and (2) AWC had a lot of "positive things" going on at Vanderbilt. (Docket No. 37, RSAMF Nos. 22, 23.) However, these references are taken out of context. As to the "maintaining" reference, the actual deposition exchange, in relevant part, is as follows:

> Q: I know at some point you feel like the Vanderbilt account started suffering, because of the environment and just the working relationship. Were you getting less projects from Vanderbilt at all?
> A: I sensed that . . . .
> . . .
> So I was starting to recognize that some [ ] things were suffering. So the account was still maintaining, but I viewed that your question, were we losing some opportunities, I felt like we were. I felt like we weren't being considered for some [ ] things where we should have been.

(Docket No. 31-2 (Ex. 1) at pp. 91-93.) The statement that AWC's existing business with Vanderbilt was "maintaining" is not inconsistent with Limmer's beliefs about missing opportunities.

As to the "positive things" reference, this testimony was about an earlier period of time in Mencarelli's employment (when Limmer decided to allow her to remain on salary), not about the time that Limmer began to perceive potentially deteriorating relationships or opportunities. (*Id.* at p. 91.) Indeed, the very next answer given in Limmer's deposition, after noting that there had been "positive things" in the Vanderbilt relationship, is the exchange set forth above in which Limmer noted that he "sensed" that, at some later point in time, the Vanderbilt account had nonetheless started suffering. (*Id.* at pp. 91-92.) Accordingly, Mencarelli does not raise disputed issues of material fact on these points.

recognized tension in a meeting between Mencarelli and Fritsch and that she wanted Limmer to

be aware of it. Limmer believed Sieve's telling him directly about tension between Mencarelli

and Fritsch indicated a lack of confidence on Vanderbilt's part in Mencarelli, because Mencarelli

is the account manager and, if Vanderbilt had confidence in Mencarelli, Vanderbilt would have

approached Mencarelli directly instead of reporting this to him.

Limmer also expressed to Mencarelli on several other occasions that he was discouraged

with how Mencarelli was communicating within the team, that Fritsch was not her dedicated

designer, and that she had to work better within the AWC team structure. Mencarelli concedes

that she had "issues with Fritsch." (Docket No. 32, RSUMF No. 59.) Mencarelli complained

that Fritsch was not always prepared. Moreover, Mencarelli was angered that, in one instance,

Fritsch caused the AWC team to be late to a meeting and did not think it was a "big deal."

(Docket No. 31-4 (Ex. 3) at p. 21.) Regardless, Limmer did not believe that Mencarelli was

accepting his feedback, and his relationship with Mencarelli began to become strained.[11]

According to Limmer, based on (1) lost confidence in Mencarelli's ability to work within the

team structure with other account managers and Fritsch,[12] and (2) feedback from Vanderbilt

_____

[11] This fact refers to "feedback" concerning job performance and interaction with Vanderbilt and AWC team members. (*See* Docket No. 31-2 (Ex. 1) at pp. 84-86.) Mencarelli attempts to create a disputed issue of fact by referring to a different portion of Limmer's deposition in which he stated that, when he asked Mencarelli to do something a certain way, she would do it as requested, albeit sometimes begrudgingly. However, that other testimony concerned the nuts and bolts "details" of account management (*e.g.*, delivering price quotes by hand rather than by fax or email), as opposed to the performance issues on which Limmer repeatedly counseled Mencarelli. (*See id.* at pp. 47-49.) Accordingly, Mencarelli does not establish a disputed issue of material fact on this point.

[12] Mencarelli points to testimony from *project manager* Kim Gardner that she never had any issues with Mencarelli. (Docket No. 37, RSAMF No. 16.) This does not create a dispute of material fact over whether Limmer believed Mencarelli had issues working with other *account managers* or *designer* Fritsch. It is also immaterial, because Limmer did not testify that

University about tension between Mencarelli and Fritsch that led Limmer to believe that Vanderbilt was starting to lose confidence in Mencarelli as well, he made the decision to terminate Mencarelli. Mencarelli, however, asserts that (1) Limmer only lost confidence in Mencarelli's ability to work with Fritsch alone, and (2) no one at Vanderbilt expressly told Limmer they had lost confidence in her. (Docket No. 32, RSUMF No. 61.)

Limmer informed Mencarelli of her termination on March 7, 2014. Mencarelli was 50 years of age when she was terminated; she was terminated a year and one-half after being hired. After Limmer terminated Mencarelli, he hired Alicia Cragg ("Cragg") to replace Mencarelli and assigned Cragg the Vanderbilt account.[13] Cragg had "five to seven" years experience working for one of AWC's competitors.[14] (Docket No. 31-2 (Ex. 1) at p. 97.) Limmer did not know Cragg's age but estimated her to be in her "mid-30s." (*Id.*)

In addition to hiring Mencarelli, during Mencarelli's employment, Limmer hired Cecilia Reeves, who was 58 years old at the time, to the position of account manager. Reeves is still employed at AWC as an account manager, and Limmer and Reeves have a good working relationship.

_____

Mencarelli's interactions with Gardner were part of his calculus for terminating Mencarelli.

[13] Limmer's deposition reveals that he had reached out to Cragg, who had been referred to him by a friend in the industry, once Limmer had "mentally made the decision" to terminate Mencarelli. (Docket No. 31-2 (Ex. 1) at p. 96.) An email from Limmer to Bob Peabody at Vanderbilt, dated March 7, 2014, establishes that Cragg had accepted an offer of employment from AWC but did not state when the acceptance had occurred, leaving open the possibility that it occurred on or before the day that Mencarelli was terminated. This question was not fully explored during Limmer's deposition. (*See* Docket No. 31-8 (Ex. 7).) However, because, as discussed *infra*, AWC concedes that Mencarelli has made out a *prima facie* case, this question is not important to the court's analysis.

[14] This is roughly the same amount of experience that Mencarelli had at JC White servicing the University of Miami account before being hired by AWC.

During her employment at AWC, Mencarelli never complained to anyone about Limmer discriminating against her. Mencarelli also never heard any age-related comments at AWC. When asked at her deposition to list "everything you can think of . . . that makes you think [Limmer] fired you because you were 50 years old at the time," Mencarelli responded "I can't think of anything offhand." (Docket No. 24-2 (Ex. B) at p. 239.) When given the opportunity, Mencarelli later stated that she had nothing to add. (*Id*. (Ex. B.) at pp. 260-61.)

When asked how AWC was "working differently as a team" on the Vanderbilt account after Mencarelli's termination, Fritsch testified that "internally [AWC is] working better as a team, and when we do have projects with Vanderbilt from start to finish, it's smoother in my opinion." (Docket No. 31-4 (Ex. 3 at p. 47.)

On September 17, 2014, Mencarelli filed the Complaint. (Docket No. 1.) The Complaint alleges age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*., and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §§ 4–21–101 *et seq*.[15] (*Id*. at ¶¶ 19-22.) On October 17, 2014, AWC answered the Complaint. (Docket No. 5.) On July 31, 2015, AWC filed the pending Motion for Summary Judgment (Docket No. 24), accompanied by a memorandum of law (Docket No. 25). On September 4, 2015, Mencarelli filed her Response. (Docket No. 31.) On September 25, 2015, AWC filed its Reply. (Docket No. 36.)

## SUMMARY JUDGMENT STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary

---

[15] The Complaint originally also included a claim for retaliation. (Docket No. 1 at ¶¶ 23-24.) However, Mencarelli dropped the retaliation claim in response to the pending motion. (*See* Docket No. 31 at p. 1.)

judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

<u>**ANALYSIS**</u>

**I.**      <u>**ADEA and THRA Legal Framework**</u>

The ADEA forbids an employer "to discharge . . . or otherwise discriminate against any individual . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014) (citing 29 U.S.C. § 623(a)(1)). The burden of persuasion is on the plaintiff to show that "age was the 'but-for' cause of the employer's adverse action." *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)). A plaintiff "may establish a violation of the ADEA by either direct or circumstantial evidence." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Where, as here, the plaintiff presents no direct evidence of age discrimination, the claim is analyzed using the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Blizzard*, 698 F.3d at 283. Under this framework, the employee first has the burden of proving a *prima facie* case of age discrimination; if she is successful, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for taking the allegedly discriminatory action. *Pierson*, 749 F.3d at 536. Finally, the employee bears the burden of proving that the employer's justification is pretext for discrimination. *Id.* Claims brought under the THRA are assessed using the same analysis as those brought under the ADEA. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 620 (6th Cir. 2006) (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996); *Dennis v. White Way Cleaners, L.P.*, 119 S.W.3d 688, 693 (Tenn. Ct. App. 2003)).

## II.     <u>Analysis of Mencarelli's Discrimination Claim</u>

Typically, to establish a *prima facie* case of age discrimination, an employee must demonstrate that "(1) he or she was a member of a protected age class (*i.e.*, at least forty years old); (2) he or she suffered an adverse employment action; (3) he or she was qualified for the job or promotion; and (4) the employer gave the job to a younger employee." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 529 (6th Cir. 2007). Here, AWC concedes that Mencarelli can establish a *prima facie* case of age discrimination (at the last step, presumably – although AWC does not explicitly state – because Mencarelli was replaced by Cragg). (Docket No. 25 at p. 10.) Accordingly, the burden shifts to AWC to set forth legitimate, non-discriminatory reasons for terminating Mencarelli.

### A.     **Legitimate, Non-Discriminatory Reasons**

AWC has introduced undisputed evidence that Limmer lost confidence in Mencarelli's ability to work effectively within AWC's team structure. This was the result of multiple factors. First, Limmer had to repeatedly counsel Mencarelli about over-utilizing and monopolizing designer Fritsch's time, despite the fact that Mencarelli knew that Fritsch was a shared employee also assigned to other account managers. Second, Limmer was dissatisfied after an incident when Limmer believed that Mencarelli had disobeyed his instructions to pull swatches and had instead given the assignment to an intern. Third, Limmer and AWC team members had been present at an important project meeting with Vanderbilt personnel at which Mencarelli did not take any notes. Limmer believed that this sent the wrong message to the AWC team members (and Vanderbilt) because it showed a lack of interest, and he again counseled Mencarelli about her behavior. Fourth, Limmer counseled Mencarelli about leaving at 5:00 p.m. every day and

not taking her laptop computer home, because he believed her failure to do so sent the message to other AWC employees (who worked past that time and were available to each other) that Mencarelli was done working for the day and unavailable.

AWC has also introduced undisputed evidence that Limmer believed that Vanderbilt's confidence in Mencarelli was diminishing. Stephanie Sieve, one of Mencarelli's main contacts at Vanderbilt, approached Limmer (rather than Mencarelli), to report that she had noticed tension between Mencarelli and Fritsch and wanted Limmer to be aware of it. Limmer has testified that he interpreted Sieve's actions as expressing a lack of confidence in Mencarelli; Limmer believed that if Sieve was confident in Mencarelli, the account manager, Sieve would have addressed the issue with her.

As market president in overall charge of networking and managing relationships with major customers, it was reasonably within Limmer's sphere of business responsibility, experience, and judgment to make these observations and draw these conclusions. Upon review of the record, Mencarelli has not raised any disputes of material fact as to AWC's proffered non-discriminatory reasons – namely, that (1) Limmer had lost confidence in Mencarelli's ability to work within the AWC team structure and (2) Vanderbilt was losing confidence in Mencarelli as well – for her termination. Accordingly, AWC carries its burden. Therefore, the burden shifts back to Mencarelli to establish that the reasons for the termination articulated by AWC are pretext for age discrimination.

### B.      Pretext

An employee may show that an employer's proffered reason for terminating her was pretext by demonstrating "that the proffered reason (1) has no basis in fact, (2) did not actually

motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Pierson*, 749 F.3d at 539 (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (*en banc*) (internal quotation marks omitted)).  Notably, though, the ADEA "was not intended as a vehicle for judicial review of business decisions." *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66, 70 (6th Cir. 1982) (citing *Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1223 (7th Cir. 1980)).  Accordingly, "courts are not intended to act as 'super personnel departments to second guess an employer's facially legitimate business decisions.'" *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 F. App'x 266, 272 (6th Cir. 2006) (quoting *Bush v. Am. Honda Motor Co.*, 227 F. Supp. 2d 780, 797 (S.D. Ohio 2002)).  A plaintiff must, therefore, do more than simply impugn the legitimacy of the asserted justification for her termination; in addition, the plaintiff "must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994).  Where a plaintiff successfully does so, an employer's business judgment is not an absolute defense to a claim of unlawful discrimination.  *See E.E.O.C. v. Yenkin-Majestic Paint Corp.*, 112 F.3d 831, 835 (6th Cir. 1997) (citing *Hartsel v. Keys*, 87 F.3d 795, 801 (6th Cir. 1996) ("The law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with.  Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons.")).  Mencarelli argues that AWC's proffered non-discriminatory reasons are pretextual for each of the three possible reasons.

First, Mencarelli argues that AWC's reasons had no basis in fact.  *Pierson*, 749 F.3d at 539.  Mencarelli contends this is true because no one from Vanderbilt ever expressly stated to Limmer that they had lost confidence in Mencarelli.  (Docket No. 31 at p. 16.)  However,

Mencarelli has adduced no evidence that Limmer, who was used to dealing with Vanderbilt

(AWC's main Nashville client) on a regular basis, did not *actually believe* that Vanderbilt was

losing confidence in Mencarelli after the (1) meeting in which Mencarelli did not take notes and

(2) conversation between Limmer and Sieve in which Sieve reported tension between Mencarelli

and Fritsch.  Rather, Mencarelli merely disagrees with Limmer's assessment of her performance

and Limmer's business judgment about what he perceived to be Vanderbilt's developing reaction

to it, and calls them both "irrelevant."  This is insufficient to show pretext.[16]  *See, e.g.*, *Mitchell*

*v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992) (holding that the plaintiff's subjective

skepticism regarding the truth of an employer's representation does not raise a triable issue as to

pretext); *see also Hedrick v. W. Reserve Cas. Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (noting that

disagreement with what an employee's supervisor considers important to an employee's job

performance is not enough to show pretext).  The court will not sit in subjective judgment

regarding Limmer's views on Mencarelli's job performance based solely upon Mencarelli's bare

assertion, bereft of evidentiary support, that Limmer did not actually believe that Mencarelli was

turning into an employee of concern.  Moreover, it was for Limmer, the market president

invested with the discretion to hire, evaluate, and fire account managers – and Mencarelli's

direct supervisor – to decide what job performance concerns were "relevant," not for Mencarelli

to make that determination.  Accordingly, Mencarelli has not established that the non-

---

[16] Mencarelli also raises the fact that AWC neither lost nor gained Vanderbilt business during her tenure as account manager and asserts that it "calls into question Limmer's credibility."  (Docket No. 31 at p. 16.)  However, this is unpersuasive; as discussed *supra* note 10, Limmer's complete testimony is that he perceived that AWC's relationship with Vanderbilt was deteriorating and that opportunities for additional business were either being missed or might be missed in the future.

discriminatory reasons proffered by AWC have no basis in fact.

Second, Mencarelli contends that AWC's articulated non-discriminatory reasons "did not actually motivate her termination." *Pierson*, 749 F.3d at 539. To prevail on this theory, Mencarelli must produce additional evidence of age discrimination "by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant." *Manzer*, 29 F.3d at 1084 (emphasis in original). In other words, Mencarelli must successfully contend that the "sheer weight of the circumstantial evidence makes it 'more likely than not' that the employer's explanation is a prextext or coverup." *Id.*

However, Mencarelli cannot point to sufficient circumstantial evidence in the record to come close to meeting a "more likely than not" standard. It is true, as AWC concedes, that Mencarelli was replaced by a younger employee. However, "[t]he isolated fact that a younger person eventually replaces an older employee is not enough" to permit an inference that the replacement was motivated by age discrimination. *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 267 (6th Cir. 1986) (citing *LaMontagne v. Am. Convenience Prods., Inc.*, 750 F.2d 1405, 1413 (7th Cir. 1984)). Thus, while this evidence was sufficient to establish a *prima facie* case, it is not sufficient to rebut pretext at this stage; additional evidence is required. *Manzer*, 29 F.3d at 1084. When asked at deposition to list "everything you can think of . . . that makes you think [Limmer] fired you because you were 50 years old at the time," Mencarelli responded "I can't think of *anything* offhand." (Docket No. 24-2 (Ex. B.) at p. 239 (emphasis added).) When given the opportunity, Mencarelli later stated that she had nothing to add. (*Id*. (Ex. B.) at pp. 260-61.) Mencarelli also does not dispute that she never heard *any* age-related comments during her employment at AWC and never raised any complaints about age discrimination during her time

at AWC.  (*Id.* (Ex. B.) at pp. 238, 247, 258, 285-86.)

In her Response brief, Mencarelli suggests that some circumstantial evidence does exist. Mencarelli asserts that Limmer did not care for her work and had personality conflicts with her. (*See* Docket No. 31 at p. 14.)  However, personality conflicts are an insufficient basis for an age discrimination claim.  *Ackerman*, 670 F.2d at 70.  In addition, Mencarelli asserts that the majority of Limmer's issues with her revolved solely around Fritsch, and, essentially, that either (1) it was Fritsch (and not Mencarelli) who was unprofessional or (2) that Mencarelli actually helped, not hurt, Fritsch.  (*See* Docket No. 14 at pp. 14-15.)  However, this misrepresents the testimony of Limmer and Fritsch.  In addition to concerns about Mencarelli's interaction with Fritsch, Limmer testified that he was *also* concerned about Mencarelli's ability to be respectful to other account managers within the team structure.  (*See* Docket No. 31-2 (Ex. 1) at p. 94.) Moreover, Fritsch explicitly testified that she (1) felt "dumped on" by Mencarelli, (2) felt Mencarelli did not respect her time, (3) could have worked less time on the Vanderbilt account (and thus had more time for other assigned work) if Mencarelli had helped her, and (4) repeatedly raised these issues with Limmer.  (*See* Docket No. 31-4 (Ex. 3) at pp. 14-18.)  The balance of evidence does not suggest that Fritsch was on the beneficial end of the relationship with Mencarelli.  In short, the record simply does not support Mencarelli's weak circumstantial evidence arguments.  Mencarelli has, therefore, not established that an illegal motivation is "more likely" than the non-discriminatory reasons proffered by AWC.

Finally, Mencarelli makes an argument under the third pretext rebuttal rationale – namely, that AWC's proffered non-discriminatory reasons were "insufficient to motivate discharge."  *Pierson*, 749 F.3d at 539.  The showing required for this third factor is "easily

recognizable" and "ordinarily consists of evidence that other employees, particularly employees in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated the discharge of the plaintiff." *Manzer*, 29 F.3d at 1084.

Mencarelli contends that AWC's reasons are unworthy of belief because they "were not universally applied to all members of AWC's Vanderbilt team." (Docket No. 31 at p. 14.) More specifically, Mencarelli contends that AWC's reasons must be pretext because Fritsch was not "held to the same standards" as Mencarelli. (*Id*. at pp. 18-19.) In support of this argument, Mencarelli points to (1) her own testimony that she informed Limmer that Fritsch was, on occasion, "not prepared in a timely manner" (Docket No. 31-3 (Ex. 2 at p. 126) and (2) testimony that, in one instance, Fritsch caused the AWC team to be late to a meeting, and Fritsch did not think it was a "big deal." (Docket No. 31-4 (Ex. 3) at p. 21.) Mencarelli asserts that the fact that she was fired, but Fritsch was not, established that AWC's proffered non-discriminatory reasons were insufficient to actually motivate Mencarelli's termination.

Mencarelli's argument fails for two reasons. First, Fritsch did not engage in "substantially similar conduct" to Mencarelli. Limmer's stated reason for firing Mencarelli was *not* that she was unprofessional. Rather, as discussed above, it was that Mencarelli's performance led Limmer to lose confidence in Mencarelli's ability to work within the AWC team structure and led Limmer to perceive that Vanderbilt was losing confidence in the Mencarelli-led AWC team as well. However, Mencarelli's allegations regarding Fritsch are clearly that Fritsch *was* unprofessional. Mencarelli, therefore, seeks to have the court compare two different types of conduct rather than substantially similar conduct. This is not an

appropriate comparison for purposes of a pretext analysis.

Second, even if their conduct were considered similar, Mencarelli and Fritsch are not similarly-situated employees for purposes of this comparison. It undisputed that Mencarelli and Fritsch had different job titles, duties, and responsibilities. Mencarelli was an account manager whose duties at AWC included managing existing accounts, looking for new account opportunities to grow AWC's business, and, overall, functioning as the liaison between AWC and its account customers. Fritsch, on the other hand, was a designer whose job duties included working for various account managers at one time to understand the customers' needs and ensure that the furniture selected for specific projects fit within designated spaces and was ordered and installed correctly. Indeed, by Mencarelli's own testimony, she did not even know how to perform some of the most basic tasks performed by designers (*e.g.*, pulling swatches). It is further undisputed that AWC teams could not function without the unique and different services provided by each of the roles of account managers, designers, and project managers.

Accordingly, Mencarelli has not demonstrated that she was similarly-situated to Fritsch in all necessary respects, nor has she established that she and Fritsch could be appropriately judged by the same standards.[17] *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998) (holding that the plaintiff must demonstrate that she is "similarly-situated to

---

[17] If there was any potential comparator at AWC, it might have been one of the five other AWC account managers. However, Mencarelli makes no such argument and contends, without legal support, that only members of the AWC Vanderbilt team are proper comparators. However, as Judge Posner articulated in the heavily-cited *Crawford v. Ind. Harbor Belt R.R. Co.*, 461 F.3d 844, 845 (7th Cir. 2006), a plaintiff "must not pick and choose" comparators. Notably, Mencarelli has adduced no evidence that account manager Cecelia Reeves – who is 58 years old (and was hired in the same time frame as Mencarelli) – has anything other than the positive relationship with AWC and Limmer to which she has testified. (*See* Docket No. 24-7 (Ex. G).)

the non-protected employee in all relevant respects"); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) ("Thus, to be deemed 'similarly-situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."); *see also Richardson v. Wayne State Univ.*, 587 F. App'x 284, 286 (6th Cir. 2014) ("But these employees undisputedly had different titles and different duties than [plaintiff] did, and thus they were not similarly situated."); *Vitt v. City of Cincinnati*, 97 F. App'x 634, 640 (6th Cir. 2004) (holding plaintiffs were not similarly-situated because plaintiffs "admitted that their job duties were different" from those of asserted comparators).

## C.    The "Same Actor" Inference

The "same actor" inference "allows one to infer a lack of discrimination from the fact that the same individual both hired and fired the employee." *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 463 (6th Cir. 1995) (citing *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)). As the Sixth Circuit has explained, it "hardly makes sense to hire workers from a group one dislikes . . . only to fire them once they are on the job." *Hartsel v. Keys*, 87 F.3d 795, 804 n.9 (6th Cir. 1996) (quoting *Proud*, 945 F.2d at 797). Accordingly, "[w]here the same person hires the employee and fires him within a short period of time, especially where the employee's class has not changed, there is a strong contrary inference of discriminatory intent."[18] *Stockman v.*

---

[18] As AWC acknowledges, in 2003 the Sixth Circuit made application of the "same actor" inference non-mandatory at summary judgment. *Wexler*, 317 F.3d at 573. However, the Sixth Circuit has explicitly noted that the inference remains applicable and "helpful" in cases where, as

*Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 801 (6th Cir. 2007).

AWC argues that the "same actor" inference applies here. It is undisputed that Limmer hired Mencarelli at age 48 and that Limmer fired Mencarelli one and one-half years later, when she was age 50. During her deposition, Mencarelli had no explanation for why Limmer suddenly developed discriminatory animus toward her because of her age only a year and one-half after he hired her. (Docket No. 24-2 (Ex. B.) at pp. 236-38.) The court similarly finds no reason in the record. Thus, as it is permitted to do, the court "infer[s] a lack of discrimination from the fact that the same individual both hired and fired" Mencarelli in a short period of approximately one and one-half years. *Schmidt v. Am. Retail Corp.*, No. 09-64-DLB, 2010 WL 5093094, at *12 (E.D. Ky. Dec. 7, 2010) (citing *Buhrmaster*, 61 F.3d at 463). Other district courts in the Sixth Circuits have reached similar conclusions. *See, e.g.*, *Lattimore v. Wild Flavors, Inc.*, No. 2009-023 (WOB-JGW), 2012 WL 208078, at *15 (E.D. Ky. Jan. 23, 2012) ("Common sense suggests that, having hired plaintiff at age forty-three, [defendants] would not be motivated by age bias less than a year later when they fired him, particularly where there is no evidence of any age-related issues or comments during that time."); *Talley v. Crosby*, No. 3:07-cv-829, 2009 WL 649778, at *6 (M.D. Tenn. March 11, 2009) (finding that the "same actor" inference served to strengthen the conclusion that the plaintiff's age discrimination claim could not survive summary judgment); *Hashem-Younes v. Danou Enters., Inc.*, No. 06-CV-15469-DT, 2008 WL 183636, at *9 (E.D. Mich. Jan. 18, 2008) (holding that plaintiff's claims of pretext were not supported by

_____

here, the plaintiff relies exclusively on circumstantial evidence to show pretext. *See Mischer v. Erie Metro Hous. Auth.*, 168 F. App'x 709, 717 n.4 (6th Cir. 2006); *see also Schmidt v. Am. Retail Corp.*, No. 09-64-DLB, 2010 WL 5093094, at *12 (E.D. Ky. Dec. 7, 2010) (citing *Mischer* and applying "same actor" inference at pretext stage to grant summary judgment to employer in ADEA case when plaintiff had no direct evidence of age discrimination).

the record, particularly because of the "same actor" inference and noting that, "given the short time between the hiring and firing, the inference becomes even stronger"); *see also, e.g., Lowe v. J.B. Hunt Transport., Inc.*, 963 F.2d 173, 175 (8th Cir. 1992) ("It is simply incredible, in light of the weakness of plaintiff's evidence otherwise, that the company officials who hired him at age fifty-one had suddenly developed an aversion to older people less than two years later.").

The inference is additional evidence that AWC's reason for Mencarelli's termination is not pretextual. While not dispositive, the inference, "viewed with the entire record[,] can support a motion for summary judgment." *Lattimore*, 2012 WL 208078 at * 15. Here, it serves to strengthen the conclusions drawn by the court that Mencarelli has not established pretext. *See Talley*, 2009 WL 649778, at *6.

**D.      Summary**

The plaintiff has made out a *prima facie* case for discrimination. AWC has proffered legitimate, non-discriminatory business reasons for Mencarelli's termination, and Mencarelli is unable to establish that these reasons are pretext on any of the possible grounds. Moreover, the "same actor" inference works strongly against Mencarelli in this purely circumstantial case. In short, the court finds no dispute of material fact as to pretext that merits submission to a jury. Because nothing in the record supports the claim that Mencarelli's age was a factor in AWC's decision to terminate her, AWC is entitled to summary judgment on Mencarelli's ADEA and THRA claims.

**CONCLUSION**

AWC's Motion for Summary Judgment (Docket No. 24) will be granted.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge